580 So.2d 743 (1991)
Travis HICKS
v.
Donald BRIDGES.
No. 89-CA-0620.
Supreme Court of Mississippi.
May 15, 1991.
Rehearing Denied June 26, 1991.
*744 Will R. Ford, New Albany, for appellant.
Thomas J. Lowe, Jr., Jackson, Ralph H. Doxey, Holly Springs, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and McRAE, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Donald Bridges filed suit against Travis Hicks in the Chancery Court of Marshall County, Mississippi, for specific performance of a land sale contract. The lower court, Honorable Anthony T. Farese, presiding, granted specific performance and ordered conveyance of the land involved to Bridges. Feeling aggrieved, Hicks has appealed to this Court and presents the following issues for decision:
I. The lower court erred in granting specific performance to Bridges.
II. The lower court erred in failing to join the lien holder, the United States Department of Agriculture, Farmer's Home Administration, as a necessary party to this suit.

FACTS
Travis Hicks, a retired printer, owned a four hundred and eighty (480) acre farm in Marshall County Mississippi. A mortgage on the Hicks farm was held by the Farmer's Home Administration (FHA). The debt secured by the farm was in excess of seven hundred thousand dollars ($700,000.00) and in the latter part of 1987 Hicks was informed that his mortgage was seriously delinquent and that his farm was subject to foreclosure.
In or about January 1987, Donald Bridges went to the Hicks' farm to inquire about purchasing a bird dog from Hicks. During Bridges discussions with Hicks, Bridges asked Hicks, if he would be interested in selling him his farm, to which Hicks responded affirmatively. According to Bridges, Hicks agreed to sell him the land on the condition that Bridges would allow Hicks to repurchase a one hundred and sixty (160) acre tract of the farm upon which Hicks' house was located. Bridges stated that Hicks agreed to sell the farm for the amount of the FHA lien upon the land.
A short time after discussing the sale, Hicks and Bridges went to the FHA office to inquire as to what procedures would be involved in transferring the farm to Bridges[1]. The FHA told Hicks and Bridges that they needed to present the FHA with a real estate contract. After the meeting with the FHA, Bridges retained an attorney from Southaven, Mississippi, to draft such a contract. The attorney testified that Bridges was in a hurry for the contract so she gave him a form contract on which she wrote the provisions that Bridges told her would be essential to the Bridges-Hicks deal.
The contract recited that the purchase price was one hundred and eighty thousand dollars ($180,000.00), three hundred and seventy five dollars ($375.00) an acre; that ten percent (10%) of the purchase price was to be paid in cash with the rest to be financed through the FHA; that Hicks *745 could live on the one hundred and sixty (160) acre tract for one year provided Hicks paid Bridges the sum of three hundred dollars ($300.00) a month rent and that at the end of the year Hicks had an option to repurchase the one hundred sixty (160) acre tract for three hundred and seventy five dollars ($375.00) an acre, plus interest, minus the three hundred dollars ($300.00), a month, previously paid over the year to Bridges. Bridges testified that he presented Hicks with the contract, tendered Hicks one hundred dollars ($100.00) in earnest money, which the contract recited, and that Hicks signed the contract. Hicks, while admitting signing the contract, denied having read it and denied receiving the earnest money.
Bridges filed an application with the FHA to determine his eligibility to obtain FHA financing.[2] Bridges met with Sonny Goolsby, the FHA assistant county agent, and tendered him the signed contract. Goolsby informed Bridges that the FHA had appraised the Hicks farm at one hundred and eighty nine thousand dollars ($189,000.00) and that the FHA would not release its lien for any amount less[3]. Goolsby told Bridges that he should get a new contract reflecting the appraised amount as the purchase price. A new contract was never executed.
On April 27, 1987 Bridges received a letter from the FHA informing him that he had been approved to assume a portion of the debt on the Hicks' farm.
In May of 1987, the FHA declared a moratorium on all foreclosures. While the moratorium was in effect the FHA was prohibited from contacting Bridges absent Hicks' request. Hicks never requested the FHA to sell his farm to Bridges after the moratorium went into effect. Hicks, sometime after May 1987, contacted a family friend, Hulon Warlick, about purchasing the Hicks farm. Hicks was anxious to sell Warlick the farm since Warlick agreed to let Hicks operate and reside upon the farm after he purchased the same. Warlick, however, never made an application to the FHA to purchase the farm.
In January of 1988, Hicks became aware of a recent federal regulation which gave favorable treatment to farmers who wished to keep their farm in the family. In light of this regulation, on January 12, 1988, Hicks requested the FHA to approve his daughter, Vicky Lane, for the purchase of his farm. On January 22, 1988, as a result of Hicks' request, the FHA sent a letter to Bridges advising him that they would withdraw his application to purchase the Hicks farm as a consequence of Hicks requesting such farm be transferred to his daughter. Such letter informed Bridges that he had thirty days in which to contact the FHA or his application would be withdrawn. Bridges contacted the FHA, by telephone, on January 27, 1988, stating that he was still interested in purchasing the Hicks farm in a letter dated February 2, 1988, Bridges informed the FHA that he had filed suit against Hicks to force the sale of the Hicks' farm.
Bridges filed suit against Hicks, in the Marshall County Chancery Court, requesting specific performance. The Marshall County Chancery Court heard Bridges' cause on the 21st and 22nd days of November 1988. The testimony at trial revealed that a large deposit of gravel had been found on the Hicks' farm, subsequent to the signing of the Hicks-Bridges real estate sales contract, which would generate considerable income. The Marshall County Chancery Court found that the Hicks-Bridges contract was a valid real estate sales contract and ordered specific performance of the same.

LAW

I.
Hicks first contends that the lower court erred in specifically enforcing the *746 contract between himself and Bridges since there was no proof that the parties to the contract intended to be bound. It is a well settled principle that this Court favors a determination that an agreement is sufficiently definite, so as to carry out the reasonable intention of the parties. Busching v. Griffin, 542 So.2d 860 (Miss. 1989); Jones v. McGahey, 187 So.2d 579 (Miss. 1966). In Busching, the Court said:
A contract is sufficiently definite if it contains matter which would enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence. Having found a contract to have been made, an agreement should not be frustrated where it is possible to reach a reasonable and fair result.
Id. 542 So.2d at 863 (quoting, Jones, 187 So.2d at 584). Contracts are reasonably construed in order to determine the intentions of the contracting parties. Etheridge v. Ramzy, 276 So.2d 451 (Miss. 1973).
In Hutton v. Hutton, 239 Miss. 217, 119 So.2d 369 (1960), the Court said:
It is definitely settled that the words of a contract should be given a reasonable construction, and that courts "must if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles".
Id. at 229-30, 119 So.2d at 374.
In the case at bar, Hicks and Bridges intended to enter into a contract. Hicks testified that he and Bridges discussed the transfer of Hicks' farm; that he took Bridges to the FHA office to inquire what procedures would have to be taken to sell his farm to Bridges; that Hicks and Bridges were told that a contract of sale would be needed; and that shortly after Bridges presented Hicks with such a contract Hicks signed same. The contract recited a description of the property in question, the purchase price of one hundred and eighty thousand dollars ($180,000.00), and provisions whereby Hicks retained a one year option to repurchase a portion of the land tendered.[4] The terms of the document signed by Hicks are sufficiently definite to form a contract.
Hicks contends that the contract should be voided, although he signed the same, because he never read such contract. A person cannot avoid a signed, written contract on the grounds that he did not read it. In the case at bar, there was no inducement not to read the contract or fraudulent representations made to Hicks by Bridges. McCubbins v. Morgan, 199 Miss. 153, 23 So.2d 926 (1945).
In Busching, the Court said:
To permit a party when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.
Id. at 865 quoting, Alliance Trust Co. v. Armstrong 185 Miss. 148, 163-64, 186 So. 633, 635 (1939).
Hicks further claims that Bridges should not have been granted specific performance since there was an eleven month delay between the execution of the sale contract and the time when Bridges filed suit to compel such sale. However, time is not ordinarily regarded as of the essence of contracts unless it is expressly stated or is necessarily implied from the character of the obligation assumed. Hamilton v. Bradford, 502 F. Supp. 822, 829 (S.D.Miss. 1980).
In the present case, the contract contained no language which expressed or suggested that time was of the essence. Bridges' delay in acting upon the contract was not unreasonable under the circumstances. Hicks knew that Bridges was attempting to secure financing through the FHA and that procedures were being met to comply with FHA regulations. While Bridges waited to hear from the FHA, a *747 moratorium went into effect which delayed the transfer. Bridges filed suit to compel Hicks to transfer the farm as soon as he learned that the FHA would no longer be processing his application, as a consequence of Hicks' requesting such agency to transfer the farm to his daughter. Bridges' delay in pursuing the transfer of the Hicks' farm was reasonable.
Finally, Hicks asserts that the real estate sales contract was impossible to perform since the contract recited one hundred and eighty thousand dollars ($180,000.00) as the purchase price and the FHA required the sum of one hundred and eighty nine thousand dollars ($189,000.00) in order to release its lien against the Hicks farm.
In Browne & Bryan Lumber Co. v. Toney, 188 Miss. 71, 194 So. 296 (1940), the Court said:
"When a party by his own contract creates a duty or charge upon himself he is bound to discharge it, although so to do should subsequently become unexpectedly burdensome or even impossible; the answer to the objection of hardship in all cases being that it might have been guarded against by a proper stipulation."
Browne, 188 Miss. at 83, 194 So. at 298 (quoting Piaggio v. Somerville, 119 Miss. 6, 17, 80 So. 342, 344 (1918)); See also Osborne v. Bullins, 549 So.2d 1337 (Miss. 1989).
But where a party, by his own contract engages to do an act, it is deemed his fault and folly, that he did not thereby expressly provide against contingencies, and exempt himself from liability in certain events; and in such a case, therefore ... performance is not excused by an inevitable accident or other contingency, although not forseen by, or within control of the party.
Browne at 83, 194 So. at 298.
The fact that the FHA required a greater sum than Bridges and Hicks agreed to, in order that its lien be released, in no way increased Hicks' burden of performance. Hicks may still sell his interest in the farm to Bridges for the stated purchase price of one hundred and eighty thousand dollars ($180,000.00).
The first issue is resolved against Hicks.

II.
The Farmer's Home Administration is not an indispensable party. The lower court order neither impaired nor impeded the interest of the FHA. None of the FHA's rights were affected by the lower court's adjudication. The only effect of the lower court's judgment is to transfer Hicks' interest in the property subject to the conditions of the sales contract to Bridges. Neither Hicks or Bridges disputed the fact that the FHA has a valid lien against the farm in question. The action brought in the lower court was only to determine the respective rights of Hicks and Bridges in the Hicks' farm as a consequence of the sales contract. We are of the opinion that the Farmers Home Administration was not an indispensable party to the action below. R.Miss.Civ.Proc. 19(a); See also Ladner v. Quality Exploration Co., 505 So.2d 288, 290 (Miss. 1987).
The second issue is resolved against Hicks.
There being no reversible error in the proceedings below, the judgment of the lower court is affirmed.
AFFIRMED.
HAWKINS, and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] Prior to Hicks meeting Bridges, the FHA notified Hicks that he could avoid foreclosure of the farm by selling it to a third party.
[2] Bridges did not qualify as a FHA loan applicant as a result of his income. The FHA, however, will allow normally unqualified buyers to assume an FHA obligation on property which is in danger of default.
[3] Bridges testified that he told the FHA that it would be possible to come up with the extra nine thousand dollars ($9,000.00).
[4] From the testimony received at trial, it appears that Hicks' reason for originally selling his farm to Bridges was to prevent the foreclosure of such farm by the FHA, and, in particular, to retain an option to repurchase the portion of the farm where Hicks' dwelling was located.